IN THE UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF GEORGIA
NEWNAN DIVISION

OSMOSE UTILITIES SERVICES, )
INC., )
                                 )
      Plaintiff,                )    CIVIL ACTION FILE NO:
                                 )    3:22-cv-00185-TCB
v.                             )
                                 )
ROBIN MCDANIEL,         )
                                 )
      Defendant.             )

## FIRST AMENDED COMPLAINT FOR INJUNCTIVE RELIEF AND DAMAGES

Plaintiff Osmose Utilities Services, Inc. ("Osmose") files this First Amended Complaint for Injunctive Relief and Damages against Defendant Robin McDaniel ("McDaniel"), and respectfully shows this Court as follows:

### INTRODUCTION

McDaniel is a former Director – Business Development at Osmose. Immediately after resigning from Osmose, McDaniel began working for Quanta Utility Engineering Services ("QUES"), a direct competitor of Osmose, as a Director of Business Development. As set forth herein, McDaniel's actions in doing so directly violates her Non-disclosure, Non-competition, Non-Solicitation and Intellectual Property Agreement with Osmose dated August 4, 2020 ("Agreement").

McDaniel's unlawful conduct is blatant. Upon submitting her resignation, McDaniel lied to Osmose about where she would be working, admitting that if Osmose found out she was joining QUES they would "kick [her] out early!" The same day she submitted her resignation, she copied over 32,000 Osmose emails and files containing confidential and proprietary Osmose information from her Osmose laptop to a USB drive. Based on her lie, Osmose allowed McDaniel to work through her notice period, during which time she engaged in material misconduct, including, but not limited to, plotting with her new employer QUES to solicit Osmose customers with whom she worked and registering for a conference held by Customer A, one of Osmose's largest customers in McDaniel's territory, registering herself on behalf of QUES. Upon starting at QUES, McDaniel admittedly solicited her former Osmose customers, including setting up a tailgating event for the Iron Bowl with Customer A to solicit business on behalf of QUES, engaged in QUES's steel business in direct competition with Osmose, and participated in the Request For Proposal ("RFP") process on behalf of QUES for her former Osmose customers.

In sum, McDaniel agreed to reasonable limitations on her employment when she accepted employment at Osmose for significant compensation, and she also agreed to reasonable protections with respect to Osmose's confidential information. McDaniel breached various promises she made to Osmose. Osmose brings this

action to enjoin further violative conduct by McDaniel and for the damages already caused by such conduct.

## PARTIES, JURISDICTION, AND VENUE

1.

Osmose is a corporation incorporated under the laws of Delaware with its principal place of business in Peachtree City, Georgia.

2.

McDaniel is a resident of Alabama. McDaniel may be served with process at her residence or wherever she may be found.

3.

The Court has subject-matter jurisdiction pursuant to 28 U.S.C. § 1332(a) because the matter in controversy exceeds $75,000, exclusive of interest and costs, and the parties are diverse. Osmose seeks injunctive relief pursuant to Federal Rule of Civil Procedure 65, the value of which exceeds $75,000. The damages associated with McDaniel's breach of the Agreement, including lost business, lost profits, damage to goodwill, and reasonable costs and attorneys' fees also exceed $75,000.

4.

This Court has personal jurisdiction over McDaniel because McDaniel consented to this Court's jurisdiction in paragraph 14 of the Agreement.

5.

Venue is proper in this district pursuant to 28 U.S.C. § 1391 because it is the district agreed upon by the parties in paragraph 14 of the Agreement and because a substantial part of the events or omissions giving rise to the claims occurred in this district.

## STATEMENT OF FACTS

## BACKGROUND REGARDING OSMOSE

6.

For more than 85 years, Osmose has serviced the utility and telecommunications industries by providing technically trained work crews that perform inspections, maintenance, repairs, products, and engineering on utility and telecommunication structures.

7.

Osmose crews work across the country, whether on city streets or country roads, in swamps or rivers, or on mountains. Osmose makes utility and telecommunication structures safer and reliable to keep America safely connected and powered.

8.

Osmose provides cost-effective solutions regarding wood and steel utility and telecommunication structures. It uses data-based solutions, engineering and analytics in the areas of wood science, steel corrosion, asset management, and structure restoration, which lowers the cost of ownership, extends the lifespans of customer assets, and makes systems stronger and safer.

9.

The utility and telecommunication services industries are highly competitive businesses that are relationship-driven between customers and providers like Osmose. Through hard work, dedication, innovation, investment and proprietary intellectual property, Osmose has become a market leader in these industries.

10.

Osmose invests heavily in developing and maintaining its customer relationships. Its success in these highly competitive industries is directly dependent on its employees' knowledge of its customers' unique needs and requirements and Osmose's ability to provide top quality technology, services, and new innovative solutions to its customers. Osmose has and is currently developing pilot programs to meet its customers' needs that are unique and often involve evolving its current

practices and offerings.   McDaniel, on behalf of Osmose, recently assisted in developing and proposing such a pilot to Customer A.

11.

One of Osmose's most important assets is its team of business development employees. Osmose's business development employees receive substantial training, information, business contacts, and other advantages that provide Osmose with a competitive edge in the marketplace, including valuable proprietary information about Osmose's intellectual property, methodologies, technology, business practices, long-term and short-term strategy, and pricing terms.

12.

Osmose's offerings are specially tailored from customer to customer, so the strategies employed to develop programs and win work are trade secrets and highly proprietary.

13.

Osmose's Directors-Business Development work with all manners of confidential information, including customer data; information regarding Osmose's processes and procedures for winning business, performing work and estimating jobs; prices; and employee information, such as compensation and performance metrics.

## MCDANIEL IS HIRED AND SIGNS THE AGREEMENT

14.

In August 2020, Osmose hired McDaniel as a Director-Business Development.

15.

A Director of Business Development is generally responsible for a particular territory, which usually comprises several states. A territory's Director of Business Development is responsible for direct sales of all Osmose services and products in the closely connected utility and telecommunication markets in that territory.

16.

McDaniel was the Director-Business Development for several states in the Southeast, which at the time of her termination included, but were not limited to, Alabama, Georgia, Tennessee, South Carolina, Mississippi, North Carolina, Florida, and Illinois ("McDaniel's Territory").

17.

As part of McDaniel's duties at Osmose, she worked directly with Osmose's customers throughout her territory to establish and maintain key relationships with contacts at various levels inside each customer and to improve existing and generate new business opportunities.

18.

McDaniel was hired by Osmose and assigned to specific customers, including Customer A, due to her representations to Osmose that she could build relationships and develop business with those customers, particularly Customer A.

19.

McDaniel was hired on the strength of her representations that she could also win back certain work with Customer A after Osmose was outbid by a competitor in the previous RFP issued in 2019 by Customer A.

20.

On August 4, 2020, McDaniel and Osmose executed the Non-disclosure, Non-competition, Non-solicitation and Intellectual Property Agreement ("Agreement"). A true and accurate copy of the executed Agreement is attached as Exhibit A.

21.

Paragraph 1 of the Agreement (the "Non-disclosure Provision") provides:

Employee shall not, without Employer's express written permission, reveal or otherwise make available to any other person any trade secrets or other confidential information concerning the Employer's business. Trade secrets and confidential information shall include, but not be limited to, information concerning the make-up or formulas of Employer's products, Employer's customer lists, costs, pricing information, patterns, compilations, programs, devices, tools, methods, computer data, drawings (engineering or otherwise), techniques or processes that (i) derive an independent economic value, actual or ascertainable by proper means, by other persons who can obtain

economic value from this disclosure or use; and (ii) is the subject of efforts of the Employer that are reasonable under the circumstances to maintain its secrecy.

22.

Section 3 of the Agreement (the "Non-compete") provides:

During the period of two (2) years immediately following the expiration or termination of Employee's employment for any reason, Employee will not, either directly or indirectly, assist, engage in or be financially interested in any other business activity similar to or in competition with Employer's business or any part thereof in any state Employee worked for the Employer including but not limited to: Alabama, Georgia.

23.

Section 4 of the Agreement (the "Non-solicitation") provides:

During the period beginning on the date of this Agreement and ending two (2) years after the termination or expiration of Employee's employment for any reason, Employee will not, either directly or indirectly, (a) sell or attempt to sell any products or services competitive with Employer's products or services to any customer of Employer with whom Employee had material business dealings at any time during the last two (2) years of Employee's employment with Employer, or (b) suggest, advise or attempt to persuade any such customer to limit or discontinue its business with Employer.

24.

Section 9 of the Agreement (the "Return of Property Provision") provides:

Employee agrees that, upon termination from the Employer for any reason, including without limitation for cause or without cause, Employee shall return all property of the Employer in Employee's possession to the Employer. The term "all property of the Employer"

shall be construed broadly and shall include, without limitation, information concerning the trade secrets and confidential information. Employee agrees to return all property of the Employer in Employee's possession immediately after the effective date of termination, and the Employee agrees that Employee shall not retain any copies of any documents or electronic data, all of which are considered property of the Employer.

25.

In paragraph 7 of the Agreement, McDaniel agreed that any breach of the Non-disclosure Provision, Non-solicitation, or Non-compete "would result in irreparable injury to Employer for which it could not be adequately compensated by money damages." McDaniel further agreed that Osmose "shall therefore be entitled to an injunction, in addition to, but not in substitution of, all other legal remedies available to Employer, to be issued by any court of competent jurisdiction enjoining and restraining Employee from any violation or further violation of said covenants or any part thereof."

26.

The Agreement also provides that Osmose "shall be entitled to reasonable attorney's fees, costs and necessary disbursements" if it prevails in any action "necessary to enforce or interpret any of the rights or obligations under th[e] Agreement."

27.

Osmose has legitimate business interests supporting the Non-disclosure Provision, Non-solicitation, Non-compete, and Return of Property Provision, including the protection of its trade secrets; the protection of its valuable confidential information that otherwise does not qualify as a trade secret; the preservation of substantial relationships with specific prospective and existing customers; and customer goodwill associated with Osmose's ongoing business.

## McDaniel's Territory and Responsibilities

28.

As a Director-Business Development at Osmose, McDaniel worked directly with Osmose's customers throughout her territory to establish and maintain key relationships and business opportunities.

29.

McDaniel was one of Osmose's top business development representatives, with six large public utility and telecommunication accounts and $20-$25 million in annualized revenue. McDaniel's accounts are critical to Osmose's current and future strategic growth initiatives.

30.

The scope of work McDaniel performed for each of these accounts extended across multiple service lines and made up a material portion of Osmose's market share.

31.

McDaniel had direct and ongoing contact with Osmose's customers and business relationships.

32.

McDaniel had access to and worked with Osmose's trade secrets and other confidential information, including customer lists, strategic offerings, customer contracts, training materials and processes, internally developed materials and inspection/treatment/restoration aids, pricing and estimating methodologies, engineering strategies, services expansion, adjacency strategic growth, employee information, such as compensation and performance metrics, and other customer information.

33.

McDaniel also had access to material documents outlining pricing, strategies, pilot programs and new service offerings, strategic growth initiatives, market differentiators, contact lists, internal analyses, structure data, operational strategy,

and scope of work specifications. Her work involved detailed information about Osmose's confidential bidding and pricing methodologies.

34.

McDaniel customarily and regularly engaged customers and potential customers to maintain and grow the business.

35.

As a Director-Business Development, McDaniel was in a customer-facing sales role with large, publicly owned companies that generate millions in revenue for Osmose each year.

36.

McDaniel's role required her to promote any and all Osmose products and services directly to customers, including, but not limited to, structure inspection, structure restoration, overhead inspection (including drones), structure loading analysis, structure replacement design, stray voltage detection, emergency storm response work, padmount transformer inspection, steel tower inspection, steel tower restoration, substation assessment, joint use inspection and audit, NESC clearance inspection, infrared inspection, LiDAR structural modeling, pole pulling, asset verification and mapping, make ready design, underground inspection and maintenance, transmission tower inspection, structural engineering services,

Resiliency as a Service (RaaS), and confidential business initiatives and strategies, among others.

37.

McDaniel was the lead role in promoting, pitching, and selling Osmose's service and product profile to its customers. McDaniel often entertained customers, held and attended meetings with customers, and worked to strengthen Osmose's relationships with customers for the sole purpose of selling that customer products and services.

38.

Much of McDaniel's job duties and assigned accounts were part of a strategic plan to prepare her to sell Osmose's transmission and RaaS Solution to multiple customers.

39.

McDaniel's compensation included a bonus based on her performance as to revenue target, profit target, and other metrics tied directly to her sales.

40.

McDaniel's role required her to communicate and educate Osmose's commercial Contracts department as to what the customer wanted in the contract, overall bid strategy, recommendations for alternate proposals, input recommended

pricing, and assist in decisions regarding how much Osmose could charge a customer while ensuring to still win the bid.

41.

Osmose provided McDaniel all the resources needed to learn the ins and outs of the inspection and restoration services for the closely connected utility and telecommunications industries; knowledge she did not possess from any previous job. Through her work at Osmose, McDaniel learned the specifics of wood and steel corrosion and Osmose's corresponding products and services in a way that enabled her to pitch such information to customers.

42.

McDaniel customarily and regularly engaged in enabling the sale of services to be performed by others.

43.

McDaniel gained a high level of influence or credibility with Osmose's customers, vendors, and other business relationships by reason of Osmose's investment of time, training, and money and as a result of exposure to customers, vendors, and other business relationships during the course of her employment.

44.

McDaniel was intimately involved in the planning for or direction of Osmose's business with respect to sales and marketing for her territory as well as Osmose's long-term national strategic growth.

45.

McDaniel came into possession of and obtained customer contacts and other customer information – including Customer A's expectations in the 2022 RFP process – by reason of having worked for Osmose.

## MCDANIEL RESIGNS AND JOINS A COMPETITOR

46.

McDaniel submitted her resignation to Osmose on September 21, 2022, in which she acknowledged her Non-compete and her intentions to comply with it.

47.

McDaniel voluntarily terminated her employment with Osmose on October 7, 2022.

48.

At the time she submitted her resignation, McDaniel represented that she was leaving Osmose to become a Vice President of a noncompetitive engineering firm,

but Osmose later discovered that she was joining QUES, a direct competitor in direct violation of the Non-compete.

49.

If McDaniel had informed Osmose that she was joining QUES, Osmose would have accepted her resignation effective immediately, and would not have permitted her to continue to access its confidential and proprietary information.

50.

QUES is a utility services provider, providing wood and steel structure inspection, restoration, engineering and asset management for the electric utility and telecommunication industries.

51.

However, as a result of her deliberate deception, Osmose permitted her to stay in her customer-facing role for the remainder of her notice period until October 7, 2022.

52.

Contrary to her representations to Osmose, immediately after her employment with Osmose terminated, McDaniel joined QUES as a Director of Business Development, in a substantially similar position to her position at Osmose.

53.

McDaniel is performing the same or similar duties for QUES as she performed at Osmose as a Director of Business Development.  As such, her position at QUES is in direct violation of the Non-compete.

54.

During McDaniel's notice period, she continued material misconduct.

55.

While she was still working at Osmose in September of 2022, she also registered for a conference held by Customer A, albeit, she registered herself on behalf of QUES.

56.

The conference took place just a few days after her last day at Osmose.

57.

Osmose thus has reason to believe that McDaniel is seeking to sell QUES's products or services in direct competition with Osmose to Customer A.

58.

These actions are in direct violation of the Non-solicitation.

59.

McDaniel's conduct is particularly concerning because immediately prior to

her termination, McDaniel was working on several multi-million dollar bids on behalf of Osmose for Customer A.

60.

This work involved using Osmose's highly confidential information, including its pricing strategies, estimating methodologies, and growth strategy, including a RaaS pilot for expanding existing services.

61.

QUES also responded to the same Customer A RFPs to win the same work on which Osmose bid. The bidding process was still ongoing at the time McDaniel voluntarily terminated her employment with Osmose and the bidding continued for several months after she began working for QUES.

62.

As a result of McDaniel's knowledge of Osmose's confidential and proprietary information and her possession of information she admittedly downloaded to a USB drive, Osmose is substantially concerned that McDaniel is using such information to unfairly compete with Osmose on behalf of QUES, including in the bidding process with Customer A.

63.

McDaniel is also soliciting her former Osmose customers on behalf of QUES in violation of the Non-solicitation.

64.

As McDaniel admitted, her job duties at QUES involve soliciting customers on behalf of QUES.

65.

Immediately after starting at QUES, McDaniel set up a tailgating event for the Iron Bowl for Customer A to solicit business on behalf of QUES.

66.

McDaniel is also engaged in QUES's steel business in direct competition with Osmose.

67.

McDaniel also participated in the RFP process on behalf of QUES for her former Osmose customers, including Customer A.

68.

McDaniel was also involved in preparing pricing for a highly confidential project involving new innovative service offerings, and she had access to Osmose's

confidential and proprietary information including the pricing strategy, processes, and analyses related to the project.

69.

This is one of Osmose's highly confidential business initiatives, and therefore Osmose is substantially concerned that McDaniel is using such information to unfairly compete with Osmose on behalf of QUES by assisting QUES in similar projects.

### OSMOSE DISCOVERS THAT MCDANIEL MISAPPROPRIATED INFORMATION FROM OSMOSE

70.

In light of the above, Osmose initiated an investigation to determine whether McDaniel engaged in other misconduct in violation of the Agreement, including reviewing her computer-related and e-mail activity.

71.

Osmose's investigation has revealed McDaniel engaged in other unlawful activities.

72.

On or around July 29, 2022, and around the same time Osmose received Customer A RFPs, McDaniel created and started using a folder on her Osmose laptop, labeled "[Customer A] Prior To Me," where she saved several confidential

and proprietary Osmose documents related to Osmose's business with Customer A, including pricing and strategy documents and other highly sensitive documents related to Customer A's RFPs. This activity coincides with McDaniel updating her resume and is unusual because she previously saved and accessed documents that were subsequently saved in the "[Customer A] Prior To Me" folder, in other folders on her computer. She last accessed this folder on September 7, 2022. The "[Customer A] Prior To Me" folder is no longer on McDaniel's Osmose laptop.

73.

On September 21, 2022 through the next day, McDaniel connected two USB devices to her Osmose laptop. These USB devices were connected for several hours each, one being connected to the laptop for nearly 22 hours. While one of the USB devices was connected, a folder titled "Osmose email" was saved to the USB device.

74.

McDaniel admits that she downloaded Osmose information to the USB drive when she copied to "Osmose email" folder.

75.

In fact, McDaniel copied thousands upon thousands of Osmose emails and files from her Osmose laptop on to a USB drive that contained confidential Osmose information.

22

76.

Specifically, McDaniel copied over 32,000 Osmose emails and files from her Osmose laptop on to a USB drive on September 21, 2022, the day she submitted her resignation to Osmose.

77.

Many of the files she copied constitute or contain highly sensitive Osmose confidential information and/or trade secrets, including, but not limited to, customer lists, pricing information, information related to its highly sensitive RFP process, strategic offerings, and pricing and estimating methodologies.

78.

For example, on September 21, 2022 through the next day, McDaniel copied over a document titled "220919 SSS TS PIT Variance.xlsx" from her Osmose computer to her personal USB drive.

79.

The document was an Excel spreadsheet containing highly confidential information including but not limited to, opportunity values for each customer, operations expected revenue, and variance statistics.

80.

McDaniel had no valid business reason or need to be copying this information over to her personal USB.

81.

In addition, on September 21, 2022, through the next day, McDaniel copied over a document titled "2020.TVA.SSR.River Towers.1036572-72.pdf" from her Osmose computer to her personal USB drive.

82.

The document was an RFP client-deliverable containing highly confidential and proprietary information and trade secrets, including pricing schedules and attachments such as scope of work and safety plans.

83.

McDaniel had no valid business reason or need to be copying this information over to her personal USB drive, as it is specifically labeled "Proprietary Information" and states the holder should not share the document or its contents.

84.

McDaniel also copied over a document titled "SoCo Transmission RFP-Steel Pricing template.xlsx" from her Osmose computer to her personal USB drive on September 21, 2022, through the next day.

85.

The document contained highly confidential qualitative and quantitative templates, including but not limited to proposal forms, pricing rate sheets, and Osmose offerings.

86.

McDaniel had no valid business reason or need to be copying this information over to her personal USB drive as the information constitutes trade secrets specific to Osmose's RFP for Transmission Groundline Inspection Services.

87.

McDaniel also copied a document titled "Project Authorization – 2023 SoCo Distribution RFP.pdf" from her Osmose computer to her personal USB drive on September 21, 2022, through the next day.

88.

The document was an internal strategy presentation containing highly confidential information and trade secrets, including deal strategies, financial summaries, details of base and alternate bids, and revenue and pricing breakdowns for Southern Company subsidiaries, including Alabama Power, Georgia Power, and Mississippi Power.

89.

McDaniel had no valid business reason or need to copy this information to her personal USB drive as the information constitutes Osmose trade secrets.

90.

On October 10, 2022, McDaniel informed Osmose that she was returning her Osmose laptop. However, she did not send her laptop back to Osmose until October 21, 2022.

91.

While McDaniel has produced copies of the emails and documents she copied to her USB drive, upon information and belief, the USB drive and the Osmose emails and documents contained therein, remain in McDaniel's forensic vendor's possession.

92.

Osmose makes extraordinary efforts to maintain and assure that its confidential information and trade secrets are not improperly disclosed. These include requiring employees who have access to confidential information and trade secrets to sign non-disclosure agreements, restricting access to its confidential information and trade secrets on a need-to-know basis, protecting Osmose's computer systems and electronically-stored data with hardware and electronic security devices and applications, including firewalls, encrypting its data containing confidential and trade secret information, and restricting physical access to its offices using key fobs.

**MCDANIEL REFUSES TO COME INTO COMPLIANCE WITH THE AGREEMENT**

93.

Upon learning that McDaniel was working with QUES, on October 12, 2022, Osmose sent McDaniel a letter demanding that she immediately cease and desist from any activity in violation of the Agreement, including entering into or continuing an employment or consulting relationship with QUES, and that she confirm that she is in compliance with the Agreement within five days of receipt of the letter.

94.

A true and accurate copy of the October 12, 2022, cease-and-desist letter is attached as Exhibit B.

95.

On October 24, 2022, through counsel, McDaniel replied to the cease-and-desist letter and denied all allegations.

96.

McDaniel did not disclose that she had downloaded Osmose information from her laptop to a USB drive in her possession, and she did not return the information.

97.

Due to McDaniel's ongoing, unlawful conduct, Osmose faces an immediate threat of continuing irreparable harm in the form of lost goodwill as well as present and future economic loss.

98.

All conditions precedent to this action have been performed, waived, or otherwise satisfied.

## COUNT I – BREACH OF CONTRACT

### 99.

Osmose incorporates by reference the allegations in paragraphs 1 through 98 above as if fully set forth herein.

### 100.

The Agreement is a valid and enforceable contract between McDaniel and Osmose.

### 101.

As discussed above, McDaniel has violated, and remains in violation of, the Non-compete by virtue of her employment with QUES.

### 102.

As discussed above, McDaniel has violated the Agreement by providing services that are competitive with those she provided for Osmose.

### 103.

As discussed above, McDaniel has violated the Non-solicitation by soliciting her former Osmose customers on behalf of QUES.

### 104.

As discussed above, McDaniel has violated the Return of Property Provision by failing to return the Osmose emails and documents she copied to her USB drive.

105.

As more fully discussed above, upon information and belief, McDaniel has violated the Non-disclosure Provision by divulging and using Osmose's trade secrets and/or other valuable confidential information on behalf of QUES.

106.

McDaniel's ongoing breaches of the Non-compete, Non-solicitation, Return of Property Provision, and Non-disclosure Provision are causing and will continue to cause irreparable harm to Osmose, including by harming Osmose's goodwill with customers and depriving Osmose of the competitive advantages derived from its trade secrets and/or other valuable confidential information.

107.

Osmose lacks an adequate remedy at law for such irreparable harm.

108.

Osmose is entitled to temporary, preliminary, and permanent injunctive relief to enjoin further breaches by McDaniel.

109.

McDaniel's breaches of the Agreement have also directly and proximately caused damage to Osmose. Osmose is also entitled to an award of all damages

already caused by McDaniel's breach of the Agreement in an amount to be determined and proven at the time of trial.

110.

McDaniel has acted in bad faith, has been stubbornly litigious, and has caused Osmose unnecessary trouble and expense. Osmose is therefore entitled to an award of attorneys' fees and other expenses of litigation pursuant to O.C.G.A. § 13-6-11.

111.

Osmose is also entitled to an award of attorneys' fees and expenses of litigation pursuant to the prevailing party fees provision in the Agreement.

## COUNT II – DEFEND TRADE SECRETS ACT

112.

Osmose incorporates by reference the allegations in paragraphs 1 through 111 above as if fully set forth herein.

113.

The Defend Trade Secrets Act (the "DTSA") of 2016, Pub. L. No. 114-153, 130 Stat. 376, which was passed into law on May 11, 2016 and amends chapter 90 of Title 18 of the U.S. Code, forbids threatened and actual misappropriation of trade secrets "if the trade secret is related to a product or service used in, or intended for use in, interstate or foreign commerce." 18 U.S.C. § 1836(b)(1) (as amended).

114.

Under the DTSA, "trade secret" means "all forms and types of financial, business, scientific, technical, economic, or engineering information, including patterns, plans, compilations, program devices, formulas, designs, prototypes, methods, techniques, processes, procedures, programs, or codes, whether tangible or intangible, and whether or how stored, compiled, or memorialized physically, electronically, graphically, photographically, or in writing if, (A) the owner thereof has taken reasonable measures to keep such information secret, and (B) the information derives independent economic value, actual or potential, from not being generally known to, and not being readily ascertainable through proper means by, another person who can obtain economic value from the disclosure or use of the information." 18 U.S.C. § 1839(3) (as amended).

115.

Under the DTSA, "misappropriation" means "(A) acquisition of a trade secret of another by a person who knows or has reason to know that the trade secret was acquired by improper means; or (B) disclosure or use of a trade secret of another without express or implied consent by a person who: (i) used improper means to acquire knowledge of the trade secret; or (ii) at the time of disclosure or use, knew or had reason to know that the knowledge of the trade secret was: (I) derived from

or through a person who had used improper means to acquire the trade secret; (II) acquired under circumstances giving rise to a duty to maintain the secrecy of the trade secret or limit the use of the trade secret; or (III) derived from or through a person who owed a duty to the person seeking relief to maintain the secrecy of the trade secret or limit the use of the trade secret; or (iii) before a material change of the position of the person, knew or had reason to know that (I) the trade secret was a trade secret and (II) knowledge of the trade secret had been acquired by accident or mistake." 18 U.S.C. § 1839(5) (as amended).

116.

Osmose has invested considerable time, effort, and expense in developing its confidential information and trade secrets.

117.

Osmose derives economic value from the fact that its trade secrets are not generally known to individuals or entities outside of Osmose.

118.

Osmose takes reasonable efforts to ensure the confidentiality and protection of its confidential information and trade secrets.  Such measures include but are not limited to the following:

- Requiring employees who have access to confidential information and trade secrets to sign non-disclosure agreements;

- Restricting access to its confidential information and trade secrets on a need-to-know basis;

- Protecting Osmose's computer systems and electronically-stored data with hardware and electronic security devices and applications, including firewalls;

- Encrypting its data containing confidential and trade secret information; and

- Restricting physical access to its offices using key fobs.

119.

McDaniel acquired Osmose's trade secrets under circumstances giving rise to a duty to maintain the secrecy of the trade secrets.

120.

McDaniel knew she had a duty to maintain the secrecy of Osmose's trade secrets.

121.

McDaniel misappropriated Osmose's trade secrets when she copied over 32,000 emails and documents from her Osmose laptop to her USB drive.

122.

Upon information and belief, McDaniel's forensic vendor remains in possession of the USB drive containing the Osmose emails and documents.

123.

The information McDaniel copied to the USB drive include trade secrets related to products or services used in, or intended for use in, interstate commerce.

124.

This information derives independent economic value, both actual and potential, from not being generally known to, and not being readily ascertainable through proper means by, another person who can obtain economic value from the disclosure or use of the information.

125.

McDaniel's actions constitute misappropriation in violation of the DTSA.

126.

As a result of McDaniel's willful and malicious misappropriation of Osmose's trade secrets, Osmose has suffered and continues to suffer damages in an amount to be proven at trial.

127.

McDaniel's actions will continue to cause irreparable harm and damages to Osmose and its trade secret information if McDaniel is not permanently restrained.

## COUNT III – GEORGIA TRADE SECRETS ACT

128.

Osmose incorporates by reference the allegations in paragraphs 1 through 127 above as if fully set forth herein.

129.

The Georgia Trade Secrets Act, O.C.G.A. section 10-1-760, *et seq.* ("GTSA"), prohibits any person from misappropriating trade secrets by improper means, e.g., theft, bribery, breach of contract or other duty, including inducement of such breach.

130.

The "actual or threatened misappropriation [of a trade secret] may be enjoined." O.C.G.A. section 10-1-762. In addition to or in lieu of injunctive relief, a person is entitled to recover damages for trade secret misappropriation. O.C.G.A. section 10-1-763.

131.

By virtue of her performance of her responsibilities for Osmose, McDaniel was given access to trade secrets of Osmose.

132.

As set forth above, McDaniel improperly took trade secrets of Osmose while she was employed and working for Osmose in Georgia.

133.

McDaniel's misappropriation, retention, and actual and/or threatened use and disclosure of Osmose's trade secrets violates the GTSA.

134.

McDaniel misappropriated Osmose's trade secrets by improper means within the meaning of O.C.G.A. section 10-1-761.

135.

Osmose has suffered and will continue to suffer actual damages caused by McDaniel's misappropriation of its trade secrets in an amount to be proven at trial.

136.

McDaniel's misappropriation of Osmose's trade secrets was willful, wanton, reckless and malicious, entitling Osmose to an award of exemplary damages in an amount authorized by O.C.G.A. section 10-1-763(b).

137.

Pursuant to O.C.G.A. section 10-1-764, Osmose is entitled to an award of its attorneys' fees and costs incurred in this action because McDaniel has willfully and maliciously misappropriated the trade secrets of Osmose.

## PRAYER FOR RELIEF

WHEREFORE, Osmose prays of this Honorable Court as follows:

A.     For preliminary and permanent injunctive relief restraining McDaniel, and those persons in active concert or participation with her, from further violating the Non-compete, Non-solicitation, and Non-disclosure Provision.

B.     For preliminary and permanent injunctive relief restraining McDaniel from using in any manner, or otherwise disclosing to any third party, any and all information in her possession, custody, or control which McDaniel received or took from Osmose;

C.     For an order requiring McDaniel to return to Osmose all of its confidential, proprietary, and trade secret information, and any other property she has misappropriated;

D.     For a judgment against McDaniel in an amount to be determined and proven at the time of trial;

E.     For an award of Osmose's costs, reasonable attorneys' fees, and other expenses of litigation; and

F.     For such other and further relief as this Court deems just, proper, and equitable under the circumstances.

Dated: February 13, 2023                    Respectfully Submitted,

BERMAN FINK VAN HORN P.C.

By:     */s/ Kenneth N. Winkler*
         Benjamin I. Fink
         Georgia Bar No. 261090
         Email: bfink@bfvlaw.com
         Kenneth N. Winkler
         Georgia Bar No. 770749
         Email: kwinkler@bfvlaw.com
         Daniel H. Park
         Georgia Bar No. 930188
         Email: dpark@bfvlaw.com
         3475 Piedmont Road NE
         Suite 1640
         Atlanta, GA 30305
         (404) 261-7711

         *Counsel for Plaintiff*
         *Osmose Utilities Services, Inc.*

## <u>CERTIFICATE OF COMPLIANCE</u>

Pursuant to Local Rules 7.1D and 5.1B, the undersigned counsel certifies that

this document complies with the Local Rules' requirements as to font in that it has

been prepared in Times New Roman, 14 point.

Dated: February 13, 2023

BERMAN FINK VAN HORN P.C.

By:   */s/ Kenneth N. Winkler*
Kenneth N. Winkler
Georgia Bar No. 770749

3475 Piedmont Road NE                    COUNSEL FOR PLAINTIFF
Suite 1640                               OSMOSE UTILITIES SERVICES,
Atlanta, Georgia 30305                   INC.
(404) 261-7711
(404) 233-1943 (Facsimile)

## <u>CERTIFICATE OF SERVICE</u>

This is to certify that I have this day served a true and correct copy of the

foregoing **FIRST AMENDED COMPLAINT FOR INJUNCTIVE RELIEF**

**AND DAMAGES** with the Clerk, United States District Court, using the CM/ECF

system and served a copy by first class mail and email as follows:

John G. Perry
James E. Connelly
Brendan H. White
Womble Bond Dickinson LLP
271 17th Street NW, Suite 2400
Atlanta, Georgia 30363
John.Perry@wbd-us.com
James.Connelly@wbd-us.com
Brendan.White@wbd-us.com
***Counsel for Defendant***

This 13th day of February, 2023.

BERMAN FINK VAN HORN P.C.

By:   */s/ Kenneth N. Winkler*
      Kenneth N. Winkler
      Georgia Bar No. 770749
      kwinkler@bfvlaw.com

3475 Piedmont Road, NE      COUNSEL FOR PLAINTIFF
Suite 11640      OSMOSE UTILITIES SERVICES,
Atlanta, Georgia 30305-6400      INC.
(404) 261-7711
(404) 233-1943 (Facsimile)